IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

DAVID HEATON, ORVIS CLARK III,)
JAMEY MILLS and BRADLY CLARK, )
                              )   Civil No. 4:04-cv-30087
        Plaintiffs,           )
                              )
vs.                           )
                              )   RULING ON DEFENDANTS'
IOWA D.O.C. DIRECTOR GARY     )   MOTION FOR SUMMARY
MAYNARD, ISP CHAPLAIN DEL     )   JUDGMENT
VANDE KROL and REVEREND       )
KAY KOPATICH,                 )
                              )
        Defendants.           )

Before the Court is defendants' motion for summary judgment [21]. Plaintiffs filed this action on February 1, 2004, asserting violation of their right to practice their asserted religion, Satanism, under the Free Exercise Clause of the First Amendment of the U.S. Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. 2000cc-1, *et seq*. Plaintiffs also claim the Religious Services policy of the Iowa Department of Corrections (IDOC), IN-V-102, is unconstitutional because it has no time limits for response by the IDOC's religious coordinator. Plaintiffs seek declaratory relief, injunctive relief, damages and punitive damages.

Jurisdiction is predicated on 28 U.S.C. §§ 1331, 1343(a)(3) and(4). The parties consented to a magistrate judge and this matter was referred to the undersigned pursuant to 28 U.S.C. § 636(c) on September 3, 2004.

# I.

## SUMMARY JUDGMENT

Defendants are entitled to summary judgment if the affidavits, pleadings, and discovery materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Erenberg v. Methodist Hospital, 357 F.3d 787, 791 (8th Cir. 2004)(quoting Fed. R. Civ. P. 56(c)). The Court must view the facts in the light most favorable to the nonmoving party, and give that party the benefit of all reasonable inferences which can be drawn from them, "that is, those inferences which may be drawn without resorting to speculation." Mathes v. Furniture Brands Int'l, Inc., 266 F.3d 884, 885-86 (8th Cir. 2001)(citing Sprenger v. Federal Home Loan Bank of Des Moines, 253 F.3d 1106, 1110 (8th Cir. 2001)); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Erenberg, 357 F.3d at 791; Tademe v. St. Cloud State University, 328 F.3d 982, 987 (8th Cir. 2003); Lambert v. City of Dumas, 187 F.3d 931, 934 (8th Cir. 1999); Kopp v. Samaritan Health System, Inc., 13 F.3d 264, 269 (8th Cir. 1993). An issue of material fact is genuine if it has a real basis in the record. Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992) (citing Matsushita, 475 U.S. at 586-87 (1986)). A genuine issue of fact is material if it "might affect the outcome of the suit under governing law." Hartnagel, 953 F. 2d at 395 (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986)); see Hitt v. Harsco Corp., 356 F.3d

920, 923 (8th Cir. 2004); Rouse v. Benson, 193 F.3d 936, 939 (8th

Cir. 1999).

## II.

For the purposes of the present motion for summary

judgment, the following facts are undisputed.

Plaintiffs are all current or former inmates at the Iowa

State Penitentiary ("ISP") in Ft. Madison, Iowa. They all profess

to be members of the Church of Satan.

Defendant Gary Maynard is Director of IDOC. Defendant

Chaplain Del Vande Krol is the Religious Coordinator at ISP.

Defendant Reverend Kay Kopatich is the IDOC Religious Coordinator.

As Religious Coordinator for IDOC, Reverend Kopatich

evaluates and monitors the religious services that are provided to

inmates at all IDOC institutions. One of her roles is to evaluate

and approve practices for proposed religious groups within the

IDOC. (Kopatich Affidavit).

In years past ISP had allowed the Church of Satan to

conduct services in the prison chapel during the same time allotted

to what the institution classified "Pagan Religions," with members

of the Wiccan and Asatru groups.

In May 2002 IDOC revised its policies and adopted a new

Religious Services Policy, No. IN-V-102 (the "New Religion"

policy).(Kopatich Aff., Ex. A). The new policy sets out a procedure

3

by which inmates may apply for recognition of a new religion or religious group.

On January 13, 2003 plaintiff Heaton submitted a new religion request under the policy in order to gain the advantages recognized status brings. On January 27, 2003 Chaplain Vande Krol interviewed Heaton concerning the request and recommended approval, subject to proposed alternative accommodations and identification of specific requests for which the institution expressed security concerns. (Kopatich Affidavit, Ex. D). William Sperfslage, deputy warden of ISP, also reviewed the request.

While the request was pending, on September 4, 2003, Chaplain Vande Krol sent a memo notifying church members and key institutional personnel that because of "[d]ifferences between the practice of Wicca and Church of Satan [which had] been developing for some time," the Church of Satan would not be permitted to meet in the chapel until it was granted recognition by IDOC and the name "Pagan Religions" under which the groups had met would be changed to "Wicca." (Kopatich Affidavit, Ex. B).

Upon receipt of Heaton's request, Reverend Kopatich conducted a nation-wide survey of other prisons to determine how other institutions had handled the practice of Satanism. She obtained copies of the polices for state institutions in Arkansas, Minnesota, Nebraska, North Dakota, and South Dakota. Kopatich eventually approved the new religion request and the Church of

4

Satan was authorized to meet within the chapel in a room and at a time to be determined by Chaplain Vande Krol. The meetings would be allowed as long as there were sufficient numbers of participants in the group. Members of the Church of Satan were to be allowed a religious medallion and access to reading material as allowed by institutional officials and prior litigation. Kopatich also authorized visitation by a representative of the Church of Satan if that person otherwise met all admission criteria for religious visitors to IDOC. Finally, with regard to religious items to facilitate their faith practices, members would be allowed to keep those items reviewed and approved by ISP officials subject to institutional restrictions. (Kopatich Affidavit).

Meantime, in response to Vande Krol's suspension of Church of Satan services pending approval of Heaton's request for recognition, Heaton, Orvis Clark and Jamey Mills filed grievances concerning the suspension; Clark and Mills writing directly to Kopatich and Heaton filing a grievance with ISP. It is undisputed that plaintiffs have exhausted their administrative remedies. (Pl. Exs. A-J).

This lawsuit was filed February 11, 2004. According to plaintiffs, defendants' resistance to the request for preliminary injunctive relief, filed April 28, 2004, was the first notice they received that Church of Satan had been accorded status as a

recognized religion by IDOC. (Pl. Resistance to Def. Motion for Summary Judgment at 3; Heaton Affidavit at 3).

As a result of IDOC's recognition of the Church of Satan, the issues concerning plaintiffs' religious practices have been narrowed. Plaintiffs state they have continued to be denied the following accommodations for their religious practices: (a) darkness and privacy; (b) black hooded robes; and (c) The Satanic Bible, or at a minimum a censored version.[1] Defendants assert ISP's restrictions in these regards are justified by security concerns and prior district case law concerning Satanism, and to the extent the denial of the requested accommodations may violate plaintiffs' right to practice Satanism, defendants are entitled to qualified immunity from a suit for damages.

Defendants' motion for summary judgment does not address the entirety of plaintiffs' claims. They have pleaded and argue in their resistance that the new religion policy is unconstitutional because it places no time limitations upon response by the Religious Coordinator. They have also sought damages for the denial of the opportunity to meet and engage in group observances between Chaplain Vande Krol's memo of September 4, 2003 and about May 2004 when they learned the new religion application had been approved.

---

[1] At the commencement of litigation, plaintiffs also required an incense burner, however, plaintiffs indicate in their resistance that issue has been resolved.

Defendants' motion does not address these claims and accordingly the Court does not do so in this ruling.

### III.

Plaintiffs' claims are both statutory (RLUIPA) and constitutional (First Amendment). The standard for judging prison restrictions on alleged religious activity is different under each.

**A.**   **Religious Land Use and Institutionalized Persons Act**

RLUIPA imposes a statutory limitation on government activity which burdens an individual's exercise of religion. Defendants do not dispute its applicability to IDOC institutions. See Cutter v. Wilkinson, 544 U.S. ___, 125 S. Ct. 2113, 2118-19 n.4 (2005).

RLUIPA was Congress' second attempt to legislatively tighten the standard by which governmental burdens on religious exercise are judged. In Employment Div. Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872, 878-82 (1990), the U.S. Supreme Court held that the Free Exercise Clause of the First Amendment did not prevent enforcement of laws of general applicability which had the incidental effect of burdening religious exercise. Congress responded by enacting the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb, *et seq.*, which imposed the same strict scrutiny as RLUIPA would later. RFRA was much broader, universal in scope and applicable to all federal and state laws. City of Boerne v. Flores, 521 U.S. 507, 516 (1997). RFRA was enacted under

Congress' powers under the Fourteenth Amendment. In <u>Flores</u> the
Supreme Court held Congress exceeded its authority under the
Fourteenth Amendment and RFRA was unconstitutional as applied to
state and local authorities. <u>Id.</u> at 532-36. In RLUIPA Congress
attempted to cure the constitutional infirmity. The statute is
narrower in scope and pinned on Congress' authority under the
Constitution's Spending and Commerce Clauses. It has survived a
facial constitutional challenge that it violates the Establishment
Clause by giving greater protection to religious rights than other
constitutionally protected rights. <u>Cutter</u>, 544 U.S. at ___, 125 S.
Ct. at 2124.

>    RLUIPA adopts a demanding, strict scrutiny standard.
>
>    No government shall impose a substantial
>    burden on the religious exercise of a person
>    residing in or confined to an institution, . .
>    .even if the burden results from a rule of
>    general applicability, unless the government
>    demonstrates that imposition of the burden on
>    that person -
>    (1) is in furtherance of a compelling
>    governmental interest; and
>    (2) is the least restrictive means of
>    furthering that compelling governmental
>    interest.

42 U.S.C. § 2000cc-1(a). The statute provides a private cause of
action to obtain "appropriate relief against a government" for a
violation. <u>Id.</u> § 2000cc-2(a). "Government" is defined to include
persons acting under color of state law. <u>Id.</u> § 2000cc-5(4)(A)(iii).

>    In <u>Murphy v. Missouri Dept. of Corrections</u>, 372 F.3d 979

(8th Cir. 2004), the Eighth Circuit concluded "Congress intended

that the language of [RLUIPA] is be to be applied just as it was under RFRA." 372 F.3d at 987. This, said the court, included the "significant degree of deference" the court had accorded to the judgment of prison officials in its RFRA case law. Id. at 987-988 (citing cases). The Supreme Court's opinion in Cutter reinforces the need for "particular sensitivity to security concerns." 544 U.S. at ___, 125 S. Ct. at 2123. "Context matters" and the statute should be applied with "due deference to the experience and expertise of prison . . . administrators . . . ." Id. (quoting Grutter v. Bollinger, 539 U.S. 306, 327 (2003) and Joint Statement S7775 (quoting S. Rep. No. 103-111, p. 10 (1993), U.S. Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900).

An inmate must show, "as a threshold matter, that there is a substantial burden on his ability to exercise his religion." Murphy, 372 F.3d at 988 (citing 42 U.S.C. § 2000cc-2(b)). There are three components to proof of a substantial burden. Implicit are the requirements that the belief be religious in nature and sincerely held, requirements that were well established before, and not affected by, either RFRA or RLUIPA. See Ochs v. Thalacker, 90 F.3d 293, 296 (8th Cir. 1996)(citing Iron Eyes v. Henry, 907 F.2d 810, 813 (8th Cir. 1990)). If these are shown, to establish a substantial burden the government policy or actions:

> must "significantly inhibit or constrain
> conduct or expression that manifests some
> central tenet of a [person's] individual
> [religious] beliefs; must meaningfully curtail

9

> a [person's] ability to express adherence to
> his or her faith; or must deny a [person]
> reasonable opportunities to engage in those
> activities that are fundamental to a
> [person's] religion."

Murphy, 372 F.3d at 988 (quoting Weir v. Nix, 114 F.3d 817, 820

(8th Cir. 1997)(brackets original)(citation omitted in original)).

If the inmate establishes the exercise of his religion has been

substantially burdened, the burden of proof shifts to defendants to

establish that the burden furthers a compelling governmental

interest and is the least restrictive means of furthering that

interest.

**B.   First Amendment**

The analysis of inmate claims under the Free Exercise

Clause of the First Amendment is the same as under RLUIPA at the

first stage. The inmate must "establish that the [governmental]

action substantially burdens his sincerely held religious belief."

Weir, 114 F.3d at 820. Once this is shown, the constitutionality of

the burden is determined with reference to the four factors

outlined by the Supreme Court in Turner v. Safley, 482 U.S. 78

(1997), factors which are applied to ascertain whether the burden

is justified by legitimate penological interests. Id. at 89. These

are:

> (1) Whether there is a valid, rational
> connection between the regulation and the
> interest asserted; (2) whether alternative
> means of exercising the right remain open to
> the prisoner; (3) the effect the requested
> accommodation will have on guards, other

10

> inmates, and the allocation of prison
> resources; and (4) whether there is an
> alternative which will accommodate the
> prisoner's needs with *de minimis* impact on the
> prison's asserted interests.

Love v. Reed, 216 F.3d 682, 690 (8th Cir. 2000)(citing Turner, 482

U.S. at 89). See Thompson v. Vilsack, 328 F. Supp. 2d 974, 978

(S.D. Iowa 2004).

Because RLUIPA judges prison regulation of inmate religious activity under the stricter standard, the Court will limit its analysis to the statutory claim. However, to the extent defendants' motion for summary judgment is denied, the Court notes that the evidence and arguments put forward by defendants would not be sufficient for the Court to assess the Turner factors as they bear on the First Amendment claims.

## C. **The Requested Accommodations at Issue**

Defendants do not question for the purposes of their motion the religiosity and sincerity of plaintiffs' asserted beliefs. The motion focuses on the issues of substantial burden and the prison's justification for restricting the three accommodations sought by plaintiffs.

### 1. Darkness/Privacy

Plaintiffs claim that the Satanic rituals must be performed in the dark and want a darkened room for this purpose. Defendants understandably have a security concern. Deputy Warden William Sperfslage, by affidavit, states "[a]llowing maximum

security inmates [such as plaintiffs] alone in a dark, private area for any period of time is a security threat due to the potential for assault, illicit drug activity, sexual activity or escape. There would be no way for correctional staff to monitor any illegal or inappropriate activities that may be going on in the darkness." (Sperfslage Aff. ¶ 8).

There is a genuine issue of material fact concerning whether the inability to perform rituals in darkness substantially burdens the exercise of plaintiffs' Satanic beliefs. By affidavit plaintiffs contend darkness is essential. A letter from "Magus" Peter H. Gilmore of the Church of Satan to Chaplain Vande Krol indicates Satanists are not required to engage in rituals, but if they do find ritualizing beneficial a "daytime ritual is fine, so long as the room used can be darkened and the sunlight blocked-out." (Pl. App. to Request for Preliminary Injunctive Relief, Ex. K). Step 2 in "The Thirteen Steps" for "The Satanic Ritual" states participants are to "shut out all outside light sources" in preparation for the ritual. (The Satanic Bible at 131).[2]

---

[2] The Court received unsolicited copies of The Satanic Bible and The Satanic Rituals in the mail. Apparently Cynthia Heaton ordered them. Notice of this was given to the parties and absent objection the Court has reviewed the publications. The Court has previously had occasion to review The Satanic Bible in connection with other cases.

Clearly, being able to see and supervise maximum security inmates furthers the compelling governmental interest of maintaining prison security, but Sperfslage's affidavit does not address the existence of less restrictive means. Defendants have the burden on the point. Plaintiffs say that Native American inmates are permitted to conduct sweat lodge in darkness and privacy. (Heaton Aff. at 5; Clark Aff. at 2; Mills Aff. at 2). Evidence that other inmates have been permitted a religious accommodation requested by plaintiffs is arguably indicative of other less restrictive means to further IDOC's interest in maintaining security.

2.  Black Hooded Robes

Plaintiffs have requested black hooded robes to wear during their rituals. ISP views hooded robes as presenting a security threat because such robes "conceal the identity of the individual and would allow an individual to hide any weapons or contraband on their person." (Sperfslage Aff. at 2). Here again, the security concern is understandable.

Plaintiffs have not identified facts which would support a finding that the inability to have a black "hooded" robe substantially burdens the exercise of their beliefs. In his letter to Chaplain Vande Krol, Magus Gilmore wrote that participants in rituals "should be dressed in black, or may wear black hooded robes or capes," suggesting black apparel is important, but not

necessarily hooded robes. (Pl. Ex. K). <u>The Satanic Bible</u> on which plaintiffs rely as an expression of their core beliefs specifies black robes are to be worn by male ritual participants and "may be cowled or hooded," thus also indicating a hooded robe is not of particular significance. Plaintiff Clark says he can get by without a hooded robe covering his head. (Clark Aff. at 2). Plaintiff Mills says the dark bathrobes inmates can wear in their cells will do. (Mills Aff. at 4). Plaintiff Heaton refers to the necessity of the black robe, but not a hooded robe. (Heaton Aff. at 4).

From the affidavits of Mills and Clark it appears plaintiffs are allowed to wear dark-colored bathrobes in the cell house. It is a reasonable inference from the affidavits that plaintiffs have not been allowed to wear unhooded, black or dark bathrobes during rituals or, alternatively, black clothing. Defendants do not address these alternatives. Thus there is a disconnect on this issue which prevents summary judgment. Defendants say prison security is against robes with hoods which hide identity, plaintiffs say they can do without the hoods, but want to wear something black.

3.    <u>The Satanic Bible</u>

Finally, plaintiffs have requested a copy of <u>The Satanic Bible</u>, claiming they need this book for guidance for conducting their rituals. Officials at ISP have prohibited plaintiffs from having or acquiring this book based on this Court's ruling in

<u>Bentley v. Higgins/Reysack v. Higgins</u>, Report and Recommendation, No. 4:95-cv-90620, 90628 (S.D. Iowa Dec. 23, 1997)(hereinafter "<u>Bentley</u>"). Plaintiffs argue that the Court did not consider <u>The Satanic Bible</u> under the heightened standard of proof of RLUIPA. They offer a suggestion that they be permitted to have these books in a censored format.

Bentley was decided under the First Amendment's more deferential standard. This Court did find, however, that denying <u>The Satanic Bible</u> to the "Luciferian"[3] inmates in that case "significantly restrict[ed] plaintiffs' ability to express their faith and engage in congregate religious activity." <u>Bentley</u> at 14. It follows from <u>Bentley</u>, and the motion papers in this case, that an adequate showing of substantial burden has been made with respect to <u>The Satanic Bible</u>. In <u>Bentley</u> the Court went on to hold that notwithstanding the substantial burden, the exclusion of <u>The Satanic Bible</u> was reasonably related to legitimate penological objections under the four-factor <u>Turner</u> standard. <u>Id.</u> at 18-19. <u>Bentley</u> was pre-RLUIPA and, as noted, did not apply a strict scrutiny analysis. Defendants rely on <u>Bentley</u>, but do not make a strict scrutiny argument, particularly on the subject of whether complete exclusion of the book from ISP is the least restrictive means to further the governmental interest involved, prison

---

[3] "Luciferianism" is a part of the Satanic belief system and indistinguishable for analytical purposes. <u>Bentley</u> at 3 & n.3.

security. It follows the Court cannot grant summary judgment on the RLUIPA claim with respect to <u>The Satanic Bible</u>.

**D.   <u>Qualified Immunity</u>**

Defendants have also moved for summary judgment on the defense of qualified immunity from plaintiffs' damages claims resulting from denial of the three accommodations just discussed. When government officials engage in discretionary functions the doctrine of qualified immunity applies to claimed violations of both statutory and constitutional rights. <u>See</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818-19 (1982); <u>Hale O Kaula Church v. Maui Planning Comm'n</u>, 229 F. Supp. 2d 1056, 1067 & n.9 (D. Ha. 2002)(finding qualified immunity in a RLUIPA case). In a recent Report and Recommendation, I observed:

> In the case of a non-traditional religion which has not gained recognition, judicially or by general acceptance, where the right to exercise the claimed religious belief is dependent on an assessment of sincerity, religiosity, substantial burden, and a balancing of the penological interests implicated, it is very difficult to say prison officials should appreciate that the equation works out in favor of a clearly established right they should know would be violated by the failure to accommodate the claimed belief.

<u>Walker v. Kautzky</u>, 4:03-cv-40038, Report and Recommendation at 45 (S.D. Iowa July 8, 2005). Satanism is a non-traditional religion, though it has obtained a measure of recognition as a religion. Its belief system is not dogmatic. As Magus Gilmore's letter to Chaplain Vande Krol indicates, Satanism has few fixed rules, no

16

required rituals or observances, its practices are adaptable to circumstances, and largely dependent on what meets the individual adherent's particular psychological needs at the time. (Pl. Ex. K). This makes it more difficult for prison administrators to sort out what Satanic practices are authentically religious.

The case law concerning Satanism in prisons has been mixed. See e.g., Doty v. Lewis, 995 F. Supp. 1081 (D. Ariz. 1998)(ban on possession of candles, incense, tapestry and Satanic books was rationally related to prison security interests in high security unit); Carpenter v. Wilkinson, 946 F. Supp. 522 (N.D. Ohio 1996)(prohibition on possession of The Satanic Bible was reasonably related to legitimate penological interests); Ramirez v. Coughlin, 919 F. Supp. 617 (N.D.N.Y. 1996)(prohibition on use of three-inch metal ball during Satanic ritual not shown to be least restrictive means of furthering the interest in institutional security); Howard v. U.S., 864 F. Supp. 1010 (D. Colo. 1994)(preliminary injunction granted concerning inmate's request to perform Satanic rituals). In Bentley this Court expressly upheld the exclusion of The Satanic Bible from an Iowa prison. RLUIPA was relatively new at the time of the events in issue in this case, and its constitutionality was in doubt until the Supreme Court's Cutter decision of earlier this year. What this all boils down to is that the contours of plaintiffs' rights with respect to Satanic practices and publications under RLUIPA or the First Amendment were not

17

"sufficiently clear that a reasonable official would understand" that denial of the opportunity to perform rituals in the dark, wear hooded robes, and possess <u>The Satanic Bible</u> violated plaintiffs' rights. <u>Saucier v. Katz</u>, 533 U.S. 194, 201-02 (2001). Consequently, all defendants have qualified immunity from an action for damages with respect to the denial of the specific accommodations now in dispute.

### IV.

Defendants' motion for summary judgment is **granted in part and denied in part**. **It is granted** with respect to plaintiffs' claim for damages arising from the alleged restrictions on the exercise of their religious beliefs as discussed in subpart III(C) above, but is otherwise **denied**. A separate order will be entered setting evidentiary hearing.

The record suggests prison officials have commendably attempted to accommodate plaintiffs' religious practice requests. They know RLUIPA requires them to justify restrictions on sincere religious practices by inmates to an extent that was not required before (except for the short-lived RFRA). At the same time, deference must be accorded to the judgment of prison administrators where religious practice implicates security concerns and if there are no less restrictive alternatives, religious practice must yield. With these things in mind, the parties are encouraged to

take a fresh look at the remaining issues in an effort to resolve them.

       IT IS SO ORDERED.

       Dated this 19th day of August, 2005.

ROSS A. WALTERS
CHIEF UNITED STATES MAGISTRATE JUDGE